Case number 22-7104. Yousouf Coubaly, individually and on behalf of proposed class members, et al., appellants, versus Cargill Incorporated, et al. Mr. Collingsworth for the appellants, Mr. Boutrous for the appellees. Good afternoon, counsel. Mr. Collingsworth, please proceed when you're ready. Thank you, your honors, and good afternoon. May it please the court. I'd like to reserve, if possible, five minutes for rebuttal. The sole issue, appropriately before this court, is whether the Apple decision requires reversal of the district court's holding that plaintiffs lacked standing. That was the only decision the district court made. Based on Apple, this is an easy question because the standing issues in both cases are identical. This case was dismissed almost two years before Apple decided, and the dismissal was based on the second element of standing, whether there is causation. Applying Apple, the district court's denial of standing must be reversed since the court erred in two objective ways that Apple has now clarified as a matter of law. These issues were addressed by Apple in favor of the plaintiffs, as they should be here. First, the district court held that no causation can be based on indirect liability. For co-venturers, the theory of causation here and that was advanced in Apple, the district court erroneously required direct causation. The court said, quote, plaintiffs must establish causation separately for each defendant, and that's at the joint appendix 115 to 16. Thus, no matter how detailed the allegations were about the venture itself between the cocoa companies and the cocoa farmers, the district court would not have found that there was possibility of causation because the court denied any kind of liability except direct liability. The district court's requirement of direct causation conflicts directly with this court's holding in Apple, where the court said at page 11, or 11, excuse me, that the language in TVPRA section 1595A, establishing indirect liability for participation in a venture satisfies the constitutional minimum for causation because it mirrors the assistance required for historical aiding and abetting liability, which attributes liability to co-venturers, and they refer to the Halberstam case for that position. At 412- I think that doesn't mean that any time that a legislature calls something a venture, no matter how expansive the concept of venture it is, just by using the term venture, that means it's a close fix in the middle of aiding and abetting liability and therefore satisfies the fair traceability floor of Article 3. I agree, Your Honor. We don't need to go that far. We're just simply applying the exact manifestation of causation that the Apple court did here. And I would quote the court at 412 saying that, in enacting the TVPRA, Congress recognized a causal link between the injury of forced labor and actors who indirectly facilitate it, and that legislative judgment accords with long-standing common law for aiders and abettors. Indirect venture liability loosens the causal chain, but there is still, quote, fairly traceable link between, in that case, the miners and the tech companies. So on 412 it also said, plaintiffs plausibly allege that they are victims of forced labor in part because of the tech companies' demand for cobalt and their business relationships with the offending cobalt suppliers. And we must assume, for purposes of standing, that this suffices, that the latter part of it just to see how you would assess this under your theory. Absolutely. Suppose there's only two plantations in the Ivory Coast, Plantation A and Plantation B, and there's evidence and allegations that forced labor occurs at both of them. And then the plaintiff works at Plantation A, and then the defendant, who's a purchaser of cocoa downstream, purchases cocoa from the Ivory Coast. That's the only allegation about the defendant. We don't know whether the defendant purchases cocoa from Plantation A. We just know they purchase cocoa from the Ivory Coast, and the Ivory Coast consists of two plantations, both of which involve the use of forced labor, but only one of which is the one that the plaintiff worked at. Would that be a situation in which the defendant is participating in a forced labor venture of the kind that would surpass the fair traceability requirement based on a claim by that plaintiff against that defendant? No, Your Honor, because there's no indication that there is a venture between any companies or any plantations because they're not related. So that's not the case here where we- Why is this case not that? Because as I understand the allegations in the complaint, there's allegations that there are plaintiffs who suffered horrifying abuses and forced labor at identified plantations, and then there's allegations that the defendants have a relationship with suppliers and that they're in a venture with those suppliers, and let's even say that they're forced labor at some of those suppliers. But what I don't know that we have is a connection between the plantations at which the particular plaintiffs suffered forced labor and the plantations that are the ones that are in the direct supply chain with the defendants. That's where I'm not seeing a close of that. Sure, Your Honor. Well, first of all, these allegations about the venture and about the plantation, the relationship, the second error that the district court made was not assuming the merits are true. So we have to assume the merits are true. And in our case, we've alleged a number of things that would get us there. First, again, these must be assumed as true, but there is a venture. There's a venture that includes the cocoa plantations that source to the defendants and the defendants. We allege for each plaintiff that they're working on a plantation where they were subjected to forced labor and that one or more of the defendants do plantation. And that's paragraphs, if I may, 127, 130, 133, 136, 139. Wait, where's the one that says that the defendants source from the plantations at which the plaintiffs? These are those paragraphs. What are they? Sorry? I'm sorry. Could you name those again? Sorry. Yeah, there's a series of them. And there's a series of them because each paragraph that I'm going to enumerate relates to each specific plaintiff. So each specific plaintiff says, I worked here and this area or this plantation sourced for one or more of the defendants. Is it area or plantation? Yes, sir. No, no, it's the same thing. What J.A. page are you at? What J.A. page are you at? This is the complaint. I'm sorry, I have the paragraph numbers. I think it's 71. Okay. 127, 130, 133, 136, 139. Pick whichever one you think is the best one and we can look at that. All right. And I do think there's, you can try to persuade us otherwise, but I think there's a potential distinction between saying that the plaintiffs worked in an area and that they worked actually at a plantation. And they might have worked at an area that includes a plantation, but there may be other plantations in that same area who are the ones with which the defendants have a direct relationship. Well, we'll get, that is a merits venture question of can we prove that the 70% purchasing that the defendants do is fairly attributable to the plantations where the plaintiffs worked. And again, I think we have to assume the truth of the merits, but let's look at paragraph 127. That's the lead plaintiff, Kouvelet. He was trafficked as a child and he went to an area called Daloa on the Uzuba plantation. We know and we allege that defendants Nestle, Cargill, and Olam sourced from that area exclusively. From that area? Yes. And that would include this plantation. When you say this, that's what I'm trying, I think we're trying to clarify. When you say they sourced from that area, does that mean all the plantations in that area or that they sourced from plantations in that area, but there could be additional plantations in that area that did not provide for them? Well, in our merits causation discussion, which again, for the purposes of standing, we have to assume is true. We assert that, we allege the fact that 70% of all of the cocoa purchases from any of the areas are attributable to the seven defendants here. I don't think that's answering my question though. When you say that you identify that in this paragraph, it's Nestle, Cargill, and Olam, and you say that area was primarily supplying cocoa to those three defendants. Does that mean, I thought you had just suggested this, maybe not, that all of the plantations in that area, 100% of them, provide cocoa to these defendants? Well, we can't say 100%, but we do know that the three companies that I- 70% of the plantations- At least 70%, but in the areas that we've identified in the complaint, our understanding and what we factually alleged was that those areas provide to those three companies that I named. Can I ask the question this way? Is there an allegation that the particular plantations at which, and I'm not saying that, you may have a legal argument that that's not necessary, but I'm just asking just as a factual matter about what's in the complaint. Is there an allegation anywhere that the particular plantations at which these plaintiffs worked are ones with which the defendants had a direct relationship? No, we don't feel we need that. We have the areas and we have the fact that these companies purchase exclusively from that area, and because they're joint venturers, one or more of them is responsible for every plantation in that area, and therefore they are jointly and severally liable. How do you know that at least one of these three defendants was- did you just say was associated or was responsible for each plantation in the area? We can't say 100% again, but I think when we get into a merits causation argument that it's at least 70%, and that makes it more likely than not for purposes of establishing a preponderance of evidence that they are responsible for that particular plantation. Okay, can I go back then to- My time is up, and I'd be happy- No, no, you can keep going as long as we have questions for you. Okay, thank you for that. Can I go back to the hypothetical that I started with, which was imagine the Ivory Coast has two plantations, only two plantations, Plantation A and Plantation B, or slated to serve as both, plaintiffs worked at Plantation A, the defendant purchases cocoa from the Ivory Coast, and you agreed that that wouldn't be enough. That's correct, your honor. So then just shift the hypothetical a little bit, and instead of saying the Ivory Coast, say that's an area in the Ivory Coast. So the area in the Ivory Coast has two plantations, Plantation A and Plantation B, the plaintiff works at Plantation A, both of them are plantations at which forced labor occurs, I'll give you that too, and then what we know is the defendant purchases cocoa from that area. Is that enough? Well, it would depend on the percentage, your honor. In this case, we have identified areas that we allege are exclusively sourcing to named defendants, and they're jointly and severally liable. We also allege factually that collectively they purchase 70% of all cocoa, so that gives us a more probable... Okay, so make it that this defendant purchases 70% of the cocoa that comes out of this area, but all you know is that this defendant purchased 70% of the cocoa that comes from this area, there's two plantations in that area. One of them is the one at which the plaintiff works, the other one is one at which forced labor occurs, but it's not one where the plaintiff works. But what we know is the defendant purchased 70% of the cocoa produced by both plantations combined. Well, I would say for purposes of standing, if we allege that that particular company purchased sufficient cocoa to create a reasonable doubt, that if we assume the merits of that, that we would have standing to sue. Reasonable doubt of what? What are we... I'm just giving you no doubt at all that the defendant purchases 70% of the cocoa produced by both of those plantations, which is all the plantations in this area. We know that. And if we know that the defendant does not purchase from the plantation where the plaintiff works, then we would not be able to sue that plantation. No, we don't know that they don't purchase from that plantation, but we don't know that they do either. What we know is they purchase 70% from that area. That area consists of two plantations, only one of those plantations is the one at which the plaintiff works. And the question is, is the defendant responsible for that? Do we know that the defendant doesn't buy? I think the question for standing purposes is, is that plaintiff's injury from forced labor fairly traceable to the defendant? For purposes of standing, yes, because... Why wouldn't the answer be the same if instead of the area, it was just the Ivory Coast? Because I thought we started out by saying that wouldn't be enough if it were the Ivory Coast that consisted of two plantations. Well, in this case, what we have is we had a map and we made the allegations based on that, that there are areas where these defendants purchase from completely. And so our plaintiffs are within those areas. And that that is sufficient for purposes of standing to say that, assuming the merits of our allegation, that the defendants purchased from that plantation. I think even in terms of the merits... From that area, not from that plantation. Yes, from the area at which some of the plantations we have have names. Yeah, yeah. I'm sorry. You have named corporate does one through 10 also in this complaint. I'm trying to understand what they add. Is the theory that with the corporate does one through 10 added on top of the names defendants that you're covering 100% of the cocoa purchase from these areas? No, Your Honor. When we drafted the complaint, which was probably about four years ago, we had concerns about whether any of the defendants had subsidiaries that were unique to Cote d'Ivoire that we didn't know about, but we no longer need those does. They're irrelevant. Just one quick point before I sit down, Your Honor, is that the defendants here in assessing standing, and that's the only reason I think we're here is standing. They know that the Apple decision on all fours requires the same result here. The types of allegations about causation are exactly the same. And if we assume the merits of those, then we should be able to, like in the Apple case, have standing to sue to get to the merits. And we might lose, like the plaintiffs did in Apple, but I think we can do a better job in terms of the specific allegations. But the only thing the defendants say in addressing the causation issue is at page six of their brief that plaintiffs, quote, plaintiffs never alleged that any defendant was in a venture with any individual or entity that injured them. That's just not true. And the district court at page 119 of her opinion specifically said that we did. She said, quote, in short, they argue that because the defendants are in a venture with each other and the cocoa plantations in their supply chain, they are jointly and severally liable. Now, she ignored those because she didn't think venture merits mattered for standing, but that's one of the errors the district court made. And I think if we correct that error, we have exactly the same case as in Apple, and we have standing to sue. Thank you. Do you read Apple as having rested the standing decision on a determination that the defendants in that case had actually, just a standing part of Apple, had actually purchased cobalt that came from one of those informal mines at which the plaintiffs were working? Or do you read Apple as not having required that showing? Apple did not require that showing since we alleged that the venture purchased cobalt from a particular mine where the plaintiffs was injured. That was an allegation. When we got to the merits in that case, the court found that we didn't actually show that chain of causation. Did your complaint in that case show that, because the point was there were some mines that were sort of more industrialized and regularized, but there were also a lot of, I think it was referred to as informal mines, where there was forced labor. Collectively, the non-forced labor mines and the forced labor mines were co-mingling their product, and it would then go into these processors, and it was those people who would process it, which the cobalt would be purchased by the defendants. I did not find in that decision the determination that it was even actually feasible to ensure that each defendant had, in fact, purchased cobalt that had been sourced from a mine that used forced labor, because it was just impossible. It sort of all funneled into these processors. Is that right? So, is that like this one? No, Your Honor. I think one of the main reasons the court found there was no, on the merits, venture... I'm not talking about merits. I'm only talking about the standing part of that decision. Okay. All right. You've had some questions about whether you have alleged that one of these defendants purchased cocoa from a plantation that was sourced, sourced their cocoa from a plantation that used forced labor, and you said the best you can do is area and 70%. Yes, Your Honor. And I'm asking whether there was any more specific evidence at the standing stage of the Apple decision, or was it the same in that you had some non-forced labor sources and forced labor sources, and it all sort of got mingled together into the processors from which the defendants purchased there? I think in Apple, it did not deter the standing finding that we had standing, but I think here our allegations are much sharper. I'm just asking the question, did standing there require a finding that, in fact, Hobart had been purchased by these defendants from the very mines that used forced labor? We did allege that, and I think that, assuming that the allegations were true, that that satisfied the court. You allege that from this, from mine X, informal mine X, where so-and-so worked, that that very cobalt was purchased by defendant Y. We allege that the defendant X purchased cobalt from that mine where the child was injured or killed. Okay. And you don't have that allegation in this case? Oh, I think we have more specific allegations here. You don't. You just said the best you have is areas. Your Honor, we have much more than we had in Apple because- Because you could not, I thought you just answered in response to Chief Judge Rinovasan, that you, in fact, could not with certainty allege, you have statistical probability, but you could not with certainty allege that one of these plaintiffs worked at a cocoa plantation from which the defendants had actually sourced their cocoa. So I'm trying to get you to compare the allegations and the two complaints, whether they had the same level of specificity or not. I think we have more specificity here, Your Honor, because one of the issues in the Apple case was we couldn't say, for example, if there was a mine, how much of the output of that mine did Apple purchase or did Tesla purchase? And I think that was- Any amount of it was purchased? We just knew that it was purchased because of documentation that we had. But here- We don't have that documentation in this case. In this case, we have documentation that they purchased from the area and that the cocoa plantation was in that area. And I think that's more specific, but also what we have here- How is that more specific than having documentation that they purchased from the precise mine at which someone worked? Because here we also have allegations that there are exclusive buyer relationships with the plantations. So that if- But that doesn't do any good if you don't know where the plantations work. I understand. We certainly, for standing purposes, satisfy causation because we've identified the areas and at least 70% of all of the cocoa was purchased by the seven defendants. I didn't think in Apple there actually was those kind of- I thought what happened in Apple- I mean, I think this is helpful to you. I thought what happened- part of what's helpful enough to you carries you across the line. We'll hear from the defense counsel about that. But I thought the scenario in Apple was not that the cobalt that was purchased by one of the defendants could be traced all the way down to a mine at which the forced labor occurred. I thought what happened was what Judge Millett was hypothesizing, which is that the defendant had a relationship with a supplier and that supplier got cobalt from such a mine and also cobalt from some other mines and then it all came together from that supplier and then that supplier gave cobalt to the purchaser. And so what you know is that the purchaser had a direct line with a supplier who also had a direct line to a mine at which forced labor occurs, but you couldn't- you didn't know for sure that a piece of cobalt went all the way from that particular mine at which forced labor occurred to the defendant. You just knew that it was combined with cobalt through the intermediate efforts of a supplier who then gave cobalt to the end purchaser. But I think what you did have in Apple beyond that, because that one seems like it's- you didn't have the direct line, but you did have is that the intermediary who was doing the combining of the cobalt, they were affirmatively involved in fomenting forced labor. Yes, your honor, but we're almost at a point of comparing apples and oranges because there were problems with the chain of supply in Apple and the court was concerned that we couldn't say that Tesla had two percent, three percent, ten percent, so that they didn't have that control aspect on the merits. But for purposes of standing in both cases, we have certainly sufficient evidence to assume this true that we can connect, more likely than not, each defendant to the areas where our plaintiffs were forced to labor. I think that the additional fact here is that these exclusive relationships that they had show that for the plantations they are working with, if plaintiffs are on those plantations, the defendants have complete control over what's going on in that plantation. That's what we lacked in Apple. Okay, why don't we hear from- Thank you, Ron. Boutrous. Good afternoon, your honors. May it please the court, Theodore Boutrous, for Nestle and for all the defendants. Just to hone right in on this point, the big distinction between Apple in this case is that Apple standing analysis hinged on the fact, in the words of the court, the tech companies are in a venture with the specific companies and listed all the distributors and their subsidiaries in the DRC responsible for the forced labor that harmed the plaintiffs. That's what we're lacking here. There's no venture here. If we look at paragraphs 154 to 158 of the complaint, the venture is just these defendants and amongst themselves in the World Cocoa Organization and the like. On appeal, the plaintiffs have broadened it to say the suppliers, the farms, if we give them that, and this goes to the questions the court was asking, there's no connection between the farms on which the plaintiffs worked and these defendants, none whatsoever. Counsel quoted the district court. The district court on page 116 of the joint connect the defendants to any specific cocoa plantations. Although the complaint alleges defendants' agents visited Ivorian cocoa plantations and provided training and assistance, the complaint does not link the individual defendants to particular plantations, nor does it address the degree of influence the defendants had over the plantations on which the plaintiffs worked. We think that's dispositive under the Apple decision and under basic standing principles, that here, it's not enough to say there's a venture if you can't connect the venture and trace it in a fair way to the injuries suffered by the plaintiffs, and that's just undisputed. Counsel really had no answer because there is no answer. The area isn't enough. Summers v. Earth Island, the Supreme Court- Why isn't it for standing to have a likelihood that, in fact, an allegation that there's a likelihood that, in fact, it was- cocoa was purchased. These plantations aren't going to have records of who they enslaved. I'm not meaning records, and these are children who are not going to be able to have that level of precision. But if what the record shows, just for standing purposes, an allegation that they were sourcing from this area, plantations in this area, and this plaintiff was working, forced to work, in this area, and Company X is buying up enormous amounts of cocoa from that area, why is that not sufficient for standing purposes? Your Honor- 12 weeks on stage. Yes, Your Honor. First, yes, the allegations of what happened to these children are terrible. These companies have policies to try to combat it, working with the government, the U.S. government- My question is why- It becomes, Your Honor, from a standing perspective, and looking at the analogy with aiding and abetting, the court used in Apple. If you had an aiding and abetting claim, if Ms. Hamilton in Halberstam was aiding and abetting her husband in this horrible burglary scam that resulted in a murder, but someone else in the neighborhood had been robbed, it wouldn't be enough to say she could be held liable for that robbery, unless he connected that robbery to her husband and to the antifract. Is there a case that says you can never hold an aider and abetter liable unless you can precisely identify the defendant? No, Your Honor, but I think the cases are very clear that you can't hold- Imagine a terrorism case. But the aider and abetter, you have to identify who they aided and abetted. Aiding and abetting is very specific. And you're saying you do have to identify the principal. Yes. I'm not sure that's true. If you had somebody who was in the business of producing fake passports, offering real lessons to people on how to buy planes, but you couldn't, because the terrorists all died in the attack, ever tie them to a particular defendant. I think- And those people could not be held liable for aiding and abetting, even if we don't know which terrorists flew into which building? Well, Your Honor, maybe under those circumstances, if you could tie the alleged aider and abetter to the enterprise, but you then have to show that plaintiff was injured by those terrorists. So here, you don't have that. And it's not enough, the court said in Summers versus Irvine in the Supreme Court, statistical probability is not enough for Article III standing. And traditional tort principles, you have to be able to allege that the individual you're suing is the one that injured you. Traditional tort principles goes to the merits. True, Your Honor. That's what they're standing. But there have been standing cases that really turn on, that include tort cases, and people have been held liable for torts, let alone have standing, where it's really based on a probabilistic risk of causing harm. There have been medical products that were released that ended up causing terrible, terrible harm to people. Multiple companies produced those products, and it was impossible to tell which person's pill was the one that actually went into which person. And yet they've been able to recover based on a market power concept of tort liability. And of course, if you have enough of a probabilistic connection to establish liability, you have enough to establish standing. I think that's their theory here. I don't think, Your Honor, that I'm aware of any federal cases that have applied a market share liability theory like that and found that there was Article III standing. We cited this court's decision in the Eli Lilly case that we cite from this circuit, the ethical antitrust litigation from the First Circuit. Both said that even where like 90% of the class may have used the drug and 10% were uninjured, the First Circuit said that's not permissible for Article III standing. That's to injury. That wasn't to causation, to fair traceability. Well, here- Is that correct? That's correct. Okay. No, that's not for fair traceability. Why wouldn't it be, if it's sufficient for tort liability, why for purposes of standing under this statute, which they read and could be read as supporting sort of market power liability? It'd be a separate question whether the statute doesn't affect. But if we assume at this stage that it does, and this isn't just the, given the allegations this isn't just the long arm purchases that they had in Apple, they allege actual involvement on the farms. So we're not covered by Apple on the merits. Assume that for this question. All right. So if they're alleging that the market power here is so powerful that this venture of these defendants who control the drive to produce cocoa and to produce it at the cheapest price possible have created a market that depends entirely on having slave labor of children. Why could that not be sufficient for standing purposes? Not talking about merits. Now, first, I don't think the complaint plausibly alleges what your Honor just outlined. Exactly what they were alleging. You guys have the power, 70%, and in this particular area. So it's not just generically across the country. In these areas, you guys are driving the demand for production and controlling prices that is forcing people to do low prices, which generates the slavery. I thought they can tell me. I thought that was exactly right. They make what we've talked about as unadorned accusations that they were injured by the defendants' wrongful conduct. What they focus on. Wait, wait. Unadorned allegations of injury. Injury is accepted in this case. No, no, I'm focusing on the market power and the fact that the allegations these companies are trying to cause child labor in order to increase their profits. There's no specific. They're actually trying to. That in their efforts to obtain the cheapest price in this area where these people work, and knowing that there is an existing problem as a result of that demand for the cheapest labor possible. So putting those two together, that the force of the defendant's presence and demand for cheapest prices has caused this market of child slave labor to develop. That's just too attenuated, Your Honor, for Article III standing. It has to be traceable to the injury. And again, if I can go back to this allegation point, with the courts focusing on these allegations of assistance and technological assistance, financial assistance, there's no allegation that that was happening in order to increase child labor. In fact, the more likely inference is that they were doing it as part of the Harkin-Engel Protocol, as the Supreme Court of Justice Thomas said in the Supreme Court in the Bill versus Nestle case, in partnership with the United States government and the Ivory Coast government to minimize child labor, including forced labor. So it's not, for standing or any other purposes, appropriate under Iqbal and Twombly to assume the truth of these accusations. There are also allegations here. And again, we can clarify the specificity. So for my question, just assume this. And maybe it'll be wrong. Don't take care of the problem. That the defendants are providing supplies, training, equipment to the farms in this area. Now, if he means all the farms in the area, so they're encouraging, here's, you know, more, even if you ended up not buying from that farm for the three years or whatever, that someone was there, would the fact that you were involved in encouraging the farming there without any reference to getting rid of slave labor, would that matter? Absolutely not. I mean, it would not provide grounds for standing. You would have to, if they could argue, if they could allege that these farms where these children allegedly worked, sold cocoa to- Why did it have to be sold cocoa? If, in fact, when you're, if, let's just say, I'm not sure I'm going to read the playwright, so we'll just say company X. Company X is on the ground saying, you know, we love buying cocoa from this area. There's something about this soil. This is the best stuff. But, you know, we're only going to do it at X price. And here's what we definitely want you to say in business and be part of the regional area economy that supplies us. Here's some techniques. Here's some special tools. Here's some training. Why would that not be enough to show that you were engaged in a venture that knowingly or with reckless disregard caused slave labor to occur? Because, Your Honor, again, so Congress can try to create, obviously, causes of action that go beyond what traditional tort might be, can create standing, can identify causes of action that can be brought. But as this court said in Apple, as Supreme Court said in TransUnion, there are limits to that. And Article III provides those- So Salesforce is a case that we talked about in Apple. Yes. And in Salesforce, the description sounds a little bit like what Judge Millad is talking about. If you have a relationship and then you're doing things like supporting the venture, it doesn't mean that you necessarily want the underlying wrongful conduct to occur. But you're doing more than just an arm's length purchasing relationship. You're actually giving guidance and help and tutorials and things of that nature. And at least Apple assumes that that is a participation in a venture. Now, I suppose you could have an argument, even though it's participation in a venture, actually, Salesforce should have never gone down that road because it should have dropped out on fair traceability grounds at the standing stage. And that seems curious, I guess. But if that's where you're going, then that's analytically possible. But if the fact that that's conceivable on the merits means, like it usually does, that that means it's definitely enough to get past standing. Now, that's not to say that that's been alleged here, but in terms of the theory that underlies the question that Judge Millad's asking, why is that not basically what was going on? I think it really proves my point that in Salesforce, the allegations were that Salesforce was helping a specific notorious sex trafficking operation, that it helped it expand and that that caught in and grow. It wasn't helping individuals. It wasn't talking about particular people who are engaging in conduct so that you could, you know, it wasn't the crime of a particular person engaging in particular conduct against a particular victim. It was about this marketplace. But it was traceable to sales, to Backpage, what happened to the poor victim there, to Backpage. And because Salesforce allegedly had helped grow. It was showing that the support that was provided there actually contributed or not to the victimization of that particular woman. Yes, so the analogy would be here if they were able to show that there were suppliers like in Apple or a specific child labor forced operation in the Ivory Coast. And these companies were helping that organization. And then you could trace to that organization a child labor violation. Then you might have standing. But that's not what's happening here. I thought you said no to me. So now it sounds like you said yes to me. Well, if it was the Backpage analogy, we're jumping around between analogies. But I didn't think we were. I thought we were making the same point. And that is, apart from purchasing, can the provision of support, assistance, expert guidance for the farming operations themselves cause, create traceability for the injuries that have been caused by those who are forced to work on that farm? Not with identifying the specific farms who are being helped. That's the problem here. Well, that's why this is my company X thing. If you read their complaint as saying all plantations in that area. They have these allegations about area. I don't think they say all, Your Honor. That's what I will clarify with them. That's what I said. They just say they did business. That could be the answer to this. They're missing a word. That's why I preface this. But if that's a fair inference from their complaint, if that's a fair and reasonable inference from their complaint, that it's all. Or if they say that's what we meant and we'll amend it on remand to say that. Then I thought. I thought then you just answered it. Chief, that could be enough. If there was an allegation that it was being factual, specific batch allegation that it was being done to facilitate forced labor. Why force labor just to force? Continued operations. That wouldn't be enough. Your Honor, I'm sorry. I don't think in Salesforce, there was an allegation that the reason that Salesforce was helping back page was because it wanted the prostitution to occur. It was it was part of a commercial relationship, which is similar to. Helping the farming occur. That's correct, Your Honor. But there you had a specific relationship, and I know I keep jumping back and forth, but I think it really is crucial there. You had all these cases, a specific relationship between the ventures and there it was back page here. We don't have a back. I think that may be true, but that depends on whether it's in fact all the I thought they already disavowed that it was all the farms in the area, but we can definitely get clarification on that and that it goes to that issue, not to the kind of activity. That's being conducted by the ultimate defendant. If the defendant is conducting activity that consists of assistance beyond just purchasing. And there's obviously going to be material questions about how much assistance is enough, but the kind of stuff that Salesforce was talking about in the way it was characterized in Apple, which is the alleged business relationship is more than just a purchasing agreement. The defendant Salesforce provided direct support, specific business advice and productivity enhancing software. So that kind of stuff, which you can readily imagine with a plantation to that could be enough for standing. As long as you do have the direct relationship such that the victim is victimized by the enterprise as to which the defendant supplying assistance. Theoretically, it could be, and that's what we don't have is the identification of some farm that was being assisted. Well, they agreed that they couldn't identify where individuals work, at least the paragraph 51 allegation. And this will require clarification to declare from their side. I hope you'll be ready to answer. This does not seem to have that qualification. But operating within court to work and local farmers, and I don't know that that list is necessarily the same as if those are the ones they were. Actually, I don't know if they even know exactly which farms they were getting the cocoa from, so I don't. But if it's another problem, no, no, it's not a problem. They say, well, actually, in this area for all the farms they were doing, and they don't say that, you know, the paragraph, but it's their burdens that allege standing and they don't come close. What if they did say all the farms in the area? Would that just be game over? They have standing? I don't think so. I go back to the analogy with aiding and abetting that this court used. And if you look at the Twitter versus Tomna case, if aiding and abetting is the analogy for whether Congress could broaden standing to this broad market share, market power, the answer is no. The court in Tomna versus Twitter said that there must be culpable assistance. Exactly. To the wrong. Not to farming. How does that square with Salesforce or the way that Salesforce was described in Apple? Does the kind of stuff that Salesforce did vis-a-vis Backpage constitute conscious, culpable participation in the wrongful act, which is the prostitution? I don't. Knowledge of reckless disregard is the TVPA standard. Correct. But for purposes of the analogy that I'm using with aiding and abetting, there, at least you had the specific knowledge of the person you were assisting and the notorious behavior that they were allegedly involved in. And again, as Chief Judge, as you mentioned, standing wasn't the issue there. Maybe I may try to get to the merits here, if you let me. But there, I don't think that if Salesforce had been alleged to have been providing support to a lot of different entities, and someone was sex trafficked, that they could sue Salesforce, even if they didn't know whether Salesforce had helped the entity that injured them. That's the theory here. Right. And that's the difference between some or all, I think. I mean, all might bridge that gap, if that's true. And then you still have a question as to whether, for Article 3 purposes, if Article 3 traceability depends on a close enough facsimile to aiding and abetting liability, does the type of stuff that we're talking about, including the type of stuff in Salesforce, suffice for that? That still conceptually be a question. But it does seem like if you bridge the some to all, even, I mean, I know your position is that the complaint can't be read that way and hasn't been read that way so far. And we'll get clarification on that. But if you bridge that, then it seems like it does boil down to whether the kinds of stuff that was going on in Salesforce is a facsimile of the kinds of stuff that would be an issue here. And if so, whether that's enough for fair traceability purposes, it's possible that we were talking about the merits there and we just bypassed fair traceability. And it actually turns out that we were talking about something that should never have been talked about because you shouldn't have gotten past the standing gate to begin with. That's possible conceptually. And that may be where you go, but that's where you'd have to be, I think. And I would just say that with respect to this causation point, I think during the Apple argument, one of the questions was, had these principles ever been applied to causation as opposed to injury and as opposed to the other elements? We now have a case, the Murthy case from the Supreme Court. And there the question was, was there a concrete link between the plaintiff's injuries and the defendant's conduct? That's what we're missing here. There's no concrete link. You can speculate. You can say this might've happened. Maybe there was an injury. It's all farms in the area being aided. And that's what a 51, it just doesn't have the area limitation that they did for the workers, which is why I have the question. They had every option. They do. And that's why is that not sufficient connection? We would have to find sales force was wrong. Well, it wasn't a standing decision, Your Honor. So they didn't address it. No, but if they thought that was enough for merits liability, I'm not quite sure, but surely more than enough. I do think sales force is overly broad. The court doesn't have to disagree with it here. You think it was not standing in sales force? Your Honor, I'd have to look at it carefully, but I do think there the difference is there was a specific perpetrator who was part of the venture who was being assisted. Without that, no assistance of the specific individual that was harmed. And that's the difference between this assistance was provided to a website, an entity. There was no showing. There was no showing, as I understand the case, and I only have the opinion to do that, that that assistance itself was shown to have been the cause or even contributed to the harm to that particular individual. The woman in that case. Yeah, I think it's a real stretch for Article Three standing under those circumstances, but the court assumed it. But here there is a crucial difference. The court doesn't have to disagree with sales force, doesn't have to do anything different than Apple. The missing link for causation is that there's no, they don't say all. They had every opportunity to say all. They never asked for them in their complaint after the standing ruling against them, or even after the Apple District Court ruling. If they could say all, they would have said all. I think it conceptually that it is possible, I would think under your view, that even if a statute allowed for causation, that that doesn't mean that Article Three fair traceability is satisfied. If Article Three fair traceability requires some tether to aiding and abetting liability, and you have a statute that goes, a common law traditional aiding and abetting liability, and you have a statute that goes significantly beyond that, then I guess you could have a statute satisfied for merits purposes, but actually standing wouldn't be satisfied. Correct, correct, John. And I do want to recognize- Article Three wouldn't be satisfied. I do want to make clear, we understand that in Apple the court held that you accept the theory of venture, and then determine whether there's at least Article Three standing. Here, if we accept their venture theory, there is not Article Three standing because it misses the crucial point. The court could not have been clearer in Apple, but it was because the venture included the perpetrators who were responsible for the child forced labor. We don't have that here. It's fatal to the court. If you could just send that out for me from Apple, because in that case you had the, I'm sorry, the refiners, or processors, or whatever, the funds from which the cobalt was purchased by the defendant. But they were bringing it, they were obtaining cobalt from a mixture of entities, some of which, when we had forced labor, almost got crystal clear from the complaint, actually, they were even charging forced labor as opposed to just child labor. But if we assume that, and some that was not, was there a specific allegation in that complaint with possible factual support, that those entities, those intermediary entities, knew that the cobalt being purchased by those defendants included forced labor produced cobalt? Or was it just a statistical guess because you had, shall we call it, good labor cobalt coming in and bad labor cobalt coming into this funnel? I think for standing purposes, the way the court looked at it in Apple was, you know, the way the chief judge was describing it, that the defendants at least had knowledge that these distributors and these big companies and their subsidiaries were engaged in, allegedly engaged in this conduct. The subsidiaries were not the actual mines. The subsidiaries were the companies that sort of got the stuff from the mines, but the mines were not the subsidiaries. And that's why I say you have mines that had a mix of, what did I say, good labor cobalt and evil labor cobalt. And so, and it's just that it funneled through these entities to be processed and then sold to a defendant. And so I'm back to saying if the venture was between these processors and defendants, what evidence is there in our decision or the complaint in that case, that in fact those processors could trace any particular sale of cobalt to the evil labor mines? I think the allegation was, and the court cited it in the Apple decision, that it was not possible to trace. And that's the allegation. That's the same thing here then, isn't it? But there's a big difference, Your Honor. The difference would be here if there was an allegation that the farms or some intermediary was engaged in child forced labor. Ishmael was the recruiter, I think, in Apple, and there was a link between them and these defendants with respect to the farm. Ishmael was part of the venture? Ishmael was part of the subsidiaries and the recruiting effort to- I'm asking, was Ishmael alleged to be part of the venture? I thought Ishmael was someone who fed stuff. I think he was someone who was an agent of the venture there. We don't have anything like that here. There's no connection. Again, if there's an 80 and abetting venture, like I said, in Halberstam, if we have a venture and someone was robbed, you don't get just to say, I get to sue the- Let's look at the paragraph 51 then in the complaint. Page 29, I think. I hope the bottom number is a J. Page 29 of the KAA. Yep, I've got it. Page 27 of the complaint. Yep. The last two sentences, the training and quality control visits, so this is by the defense, beginning to get the defendants went to these farms and provided stuff. The training and quality control visits occur several times per year and require frequent and ongoing visits to the farms, either by defendants directly or via their contracted agents. Defendants and their agents constantly witness illegal child labor on the plantations under their control. Now, I know there's still the all or some, right? But if it's all, how's that different? Well, first of all- We have agents that are witnessing the child labor. Again, that's for a group lumping everyone in together. Defendants, we don't know who they're talking about, which farms they're talking about. These are the farms in the area. This is just for standing purposes. Yeah, I understand, Your Honor. And I just think, though, from standing purposes- I'm just asking whether that makes- You said there's no agents, but of course there are allegations about agents here and they were the people who were- Right, but it doesn't say that- That would be horrible. These companies don't do that. And also, I want to make one point here. You've kind of reminded me of something. You actually may have alluded to it, that a lot of the allegations in this complaint mix in child labor, which these companies are against, but they mix it in with forced labor. This is a case about forced labor. That was in Apple where it wasn't actually even clear to me looking on the complaint that it was- That's how it is here. They talk about forcing people based on hunger and need, whereas here it's quite clear. They say illegal child labor. Yeah, but they, throughout the complaint, mix in just child labor. And again, I'm not- This one's even cleaner to me on that than the Apple complaint. But again, Your Honor, I would just go back to the fact that this doesn't say that their agents were recruiting children to have forced labor. No, they were supporting these farms. And again, which is a big question. I'm holding that for you. But they were at these farms. This sounds a lot like Salesforce. Sorry, I'm thinking of my senior moment here. Salesforce, in that they are aware, they know, and they're here supporting these farms operations. That's my only point. The level, maybe I'll move to the merits if I have a few minutes, but because that's where Salesforce comes in. They're not even remotely comfortable. Here, they are, they allege, and it's and, or, the paragraphs- The question on the merits versus whether we should, if we were to get to it, whether we should decide it. Because there's now a new standard under the law, first of all. Secondly, they have these more particularized complaints about an ongoing business relationship that seemed to be missing. And Apple, Apple turned on the fact that it was just an arm's length purchaser-seller relationship. But this is definitely not predicting, of course, at this stage of the litigation, their allegations and the complaints. It absolutely is an arm's length relationship. No, it's not. There was no allegation there that the defendants in Apple were going out to the mines and providing them with technology and supplies and equipment and counsel and advice. If there had been, I have no basis for concluding that Apple would have come out the same way it did on the merits. Well, there were allegations of inspections and audits and exhortations about labor practices. By the defendants and their agents? Yes. Yes, absolutely. In the Cobalt case? In the Cobalt case, absolutely. And then one of the arguments was because they had control, because they could inspect, that that somehow created a shared enterprise. And your honor, that doesn't, the court didn't apply continuous relationship tests in Apple. It cited Salesforce. Is it equivalent to paragraph 51 in the, I just didn't, what page is that on? I mean, let me find you in, throughout. Can you just show me where it's equivalent to paragraph 51? I'm just going to look for the spot where the court talks about this in Apple. But it starts really back on pages 415, 416, where the court talks about the inspections, the audits, the. I'm talking about the opinion, not the complaint. Is that right? Right. The Apple. Okay. Sorry. I was asking about the Apple complaint, but that's okay. No, this is safe. We said, we said what it says. Yeah. I mean, this court talked about what the allegations were. Well, we clearly thought that the allegations in Apple weren't tantamount to the, to what was going on in Salesforce. Otherwise, because we assumed Salesforce, but then we still said Apple's distinct because. And if I can't, I would like to address this because those paragraphs regarding the assistance and technological assistance. If you read them, they're not, they don't allege any nefarious behavior. They say that there was help with technology, fertilizer, how to make the farming succeed. They don't allege that this and couldn't allege that it was meant to foster, force child. Well, there the court in Salesforce assume that the entire back page business model was sex trafficking. And in fact, the allegations that were, were much more egregious that when the government was going to seize a back page, the back Salesforce assisted it to go overseas. These were the allegations. I'm not endorsing them, but, um, so it was. Back to our pages here. I mean, this is, there's something that helps you. Let me know. But on four 15, we say something more than engaging in an ordinary buyer seller transaction is required to establish participation on lawful venture. Um, is where the business relationship, the business relationship is the alleged business relationship is nothing more than a purchasing agreement. And then on four 16, by contrast, you have not alleged a factual basis for a common purpose, shared profit, blah, blah, blah, but down to, um, the type of direct and continuous relationship that existed talking about Salesforce. Purchasing a commodity without more. It's not participation in the venture. There's more alleged here, but you're not characterizing the complaint is saying that there was an ongoing business relationship, an ongoing advice, supply equipment, providing relationship. Your honor, let me just give you an example. This is page 22 of the slip opinion. Example. It's not going to help me. You're going to have to give me, I don't have the slip of paper. Let me see if I can, if I can piece it together for you. I think we're jumping between the complaint. Let me just grab it. I'm sorry. No, no, it's not you section. If you guys are Roman section, hold on, I'll find it for you. I'll find the page, but the court says that the plaintiff's all in apple maintain that the tech companies are different from ordinary buyers because thank you very much. Thank you all, uh, uh, for, for ordinary buyers, because they have a contractual right to inspect and control the cobalt suppliers. And then it goes on to say, to point to the third party audit. Uh, and then the court says that a third party investigation, but that wasn't in the mind. That was the third party. I forgive me. It's well, while they, while you, um, that's of the, that's of the people within it, within a venture with the, they don't have that here. They don't have any evidence that the farms that are the wrongdoers, the perpetrators were given any assistance at all. In this case, they don't, they don't identify the farms where the plaintiff's that's, that's the whole question of whether it's some or all, but you're right. It's 51.  Let's, let's, let's put it this way. If the plantation in 51 are plantations at which the plaintiffs were injured, just assume that, right. Cause I think you're pointing out that there's a gap because those plantations, it's not all actually, all we know is that they had this kind of relationship with some plantations, but they might not have been the plantations where the plaintiffs were injured. But if these plantations are the ones at which the plaintiffs were injured, then it starts to look like the kind of things that are being described at least for purposes of standing dot for the merits. And again, even on standing, imagine in paragraph 51, that it did use the word all that may be an allegation. That's a good enough, but it's not, it doesn't seem like it'll be a plausible allegation. I mean, how could Nestle, I think there are like 2 million farms. Yes. So imagine it said all the training and quality control visits occur several times per year and frequent and ongoing visits to, and I'm going to add all 2 million farms in the ivory coast, either by defendants directly or via their contracted agents. That just seemed like an implausible allegation. I still think that's not standing. I agree. I mean, that's the problem. They're talking about an area. We don't know how big the area is. Well, that's, that's not our fault. That's the plaintiff's going to be a lower number than 2 million. It was 2 million in the country. So imagine it said 200, your honor, that would still be not plausible. And you need specific facts. Those are just for these complaints, particularly when we're talking about a statute that is meant to stop horrible harms against, in this case, children who are just not going to, you're not going to, there's not going to be records. I would bet an awful lot of money that these farms don't have records of which slave children they hired and what years they were there. Your honor, again, If you go down to like, they weren't, this was, this was their favorite area to purchase from. So we're smaller than the entire country and we don't have a sense of the farms, but if they say all the farms there for purposes, there's 2 questions for purposes of a complaint for standing, but certainly for purposes of should we send it back to the district court to address the merits and see if they need to amend the complaint to be more particularized because it certainly seems that they, if, if actually all or something, if that's true, that they would have a basis for that. It would seem quite premature for us to kick them out. Well, your honor, A, they never asked to amend when they lost on standing. Yeah, but the law has changed materially while this case is on hold. The law has not changed. The case is on hold for a reason. The court didn't remand in the Apple case where an ass with plaintiff's view doesn't question was decided by the district court. In that case, it hasn't been decided by the court fully briefed before us. We argued and the law has changed what we briefed it. They have, well, they only have a reply brief to do it. So understand where there was one. They did do a little bit, but it's not fully done. But my point more importantly is that they have the very types of allegations that we flagged an Apple as being potentially relevant. They have those and on the reading of them, they have those. And the law is materially changed. It seems to me and the district court never addressed the question. So it seems to me quite an extraordinary situation for us to go ahead and kick the case out of court. I think the court should do that. It's a case where it wasn't addressed by the district court and the law changed while it's pending appeal. And the case was held for that potential change in law while it was pending appeal. And they had particularized allegations that were flagged, in our opinion, as relevant to stating a claim. And yet we said, we're not going to give you the chance. I don't have a case with all of those elements, your honor. But we've cited a half dozen. Well, let me back up. First of all, we have at least a half dozen cases from this court where the district court has ruled on standing. This court has said, we can go ahead. This is a question of law. We've got the complaint, number one. Number two, they didn't even seek to remand for amendment after our brief in their reply brief. We briefed these very issues. We argued for the exact standard. I haven't even got to the standard this court actually applied in Apple, which was not continuous business relationship and helping them succeed as farms. It was a shared enterprise, like a partnership where both sides are sharing the risks and benefits and the upside and the downside. We have nothing like that here. Continuous business relationship language is right there in Apple. It's right there in Apple talking about Salesforce. That wasn't the test this court adopted. The court adopted explicitly on page 416, taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk and potential gain. That's the test this court applied. And that did not endorse. That paragraph on Salesforce did not endorse. We need something more. We said multiple times, we need something more than an arm's length buyer-seller relationship. If they're paragraph and maybe we should hear from Ben on whether it's all or some, but if they have something more. It's too late for all at this point. In fact, in paragraph 67 of their complaint, they say the opposite of all. They say that 70% of the cooperatives that supply the small amount of traceable cocoa bought by Nestle, only 22 cooperatives employed the standards. And they go on to say, this is on page 30, 38 to the joint appendix. They're basically saying the opposite of all. That they can't trace it to Nestle and the other companies. We're not involved with all of the plantations. But if I can go back to judge your point about ordinary contractual relationship. First of all, on page 35 of their opening brief, they say that the foundation of this version of the venture is, quote, the supplier agreements. This is a contractual relationship. These companies are buying a commodity, just like in the Apple case. These other features do not convert a contractual relationship to buy cocoa into a shared enterprise where both sides are in it together. They're investing. There's upside and downside. It's a commercial relationship. And it's not unusual in a commercial relationship for one side to provide guidance, assistance, and the like. And those paragraphs, going back to plausibility, where they allege in this generic fashion, in a vague fashion, this providing assistance to unnamed farms, as I said earlier, the most plausible, the only plausible interpretation is that they were doing this in order to combat child labor, including forced labor. As Justice Thomas pointed out in Nestle, there is this protocol with the governments of the two countries. And so, yes, this is a terrible problem, Your Honor, but there's a governmental protocol to deal with it. And this lawsuit is really, this kind of goes to extraterritoriality, that it's exactly why courts, where we need clear congressional indications. We don't even have a briefing on both sides on extraterritoriality. So it's one thing to even talk about the merits at all, but extraterritoriality may be another step in the road. I'm pushing it. Make sure there's no further questions at this point. And I think I've managed to cover all my points, and I very much appreciate the time. Thank you. Thank you, Gav. The following will give you three minutes for rebuttal, and we'll see where it goes. Excuse me, Your Honor, three? Three, yep. Thank you. Can you start by answering my question about your paragraph 51 allegation? The allegations that these defendants have provided support and supplies, equipment, advice, counsel, whatever, to farms, talking only about the farms in the area where these plaintiffs were. Are you alleging that all farms in that area are only the farms from which they actually purchased, have these supply arrangements? With all of their farms, most of which are in the areas that we- Their farms. Their farms that the defendants deal with. That's correct. Okay, so that's not all the farms in the area, let alone, I'm not even understanding, this 51, is it limited to all farms in an area? Because it's talking about within Cote d'Ivoire. All of their farms in Cote d'Ivoire- Which is the Ivory Coast. Yes. So it's not an area in the Ivory Coast, throughout the Ivory Coast. Well, I, again- All of the farms with which the defendants- And virtually all of them are in the areas that we have identified where the plaintiffs were working. But you don't claim that you had a, that these defendants had any kind of ongoing supply relationship, counsel, the paragraph 51, techniques, equipment, relationship with all farms in that area? Only the farms they had a direct relationship. And so you don't claim that they had any relationship, like the allegations in 51, with the exact farms that these plaintiffs worked on? Well, we do, Your Honor. And our allegation- We only say that they were in the area, but you haven't been able to say anything more than those farms were in the area. So you haven't been able to put the two together. It's like you've got the circle here of, here's the farms in the area, and there's some subset of farms within that area that they have this ongoing business relationship with. Your Honor, I think a fair reading of the complaint and taking our allegations is true with all reasonable inferences. For example, paragraph 127. That's, again, for the lead plaintiff, Kubalai. We say he was taken to this area, Daloa, and a specific plantation. And then we say defendants Nestle, Cargill, and Olam sourced from that area. Now, on the maps that I've seen and the information that we use to draft this complaint, I don't want to be dishonest. I don't want to say 100% of the plantations in that area sourced for Nestle, Cargill, and Olam. But I think they do. I mean, that's certainly what we meant, that there is an area that is on a map that identifies cocoa farm sources, and it says Nestle, Cargill, and Olam. I think it's a fair inference to say virtually all of the plantations in that area sourced to those three. Even the fair inference you're saying is virtually all. I mean, so we're not... Yes, but for purposes of a standing complaint... I'm not seeing the exact words you're reading from. Where are they? I mean, it's just my oversight. I'm grabbing the complaint, Your Honor. Those were my notes of what the complaint said. Right. I'd like to know what the complaint says so I can decide whether it's a fair reading of the  To know whether it's a fair reading, I need to know the thing that I'm reading. Yes, sure. The last sentence of Paragraph 127, talking about the plaintiff Cooberley, he was isolated and was the only worker there, while all defendants in the venture specifically defined in 154, 158, et cetera, are jointly and severally liable for the illegal forced labor and trafficking of plaintiffs and other children described herein. The area this plaintiff works in is not the area that I'm referring to, but the area that was primarily supplying cocoa to defendants Nestle, Cargill, and Olam. So, yes, the word primarily is there. We were hedging because we don't want to say 100%. We really honestly can't say if there's one or two plantations, but we are... I mean, in that direction, it doesn't matter because that's just whether all of their cocoa was going to these defendants. I think then the relevant question is whether all the defendants' cocoa was coming from this area, I think. I think that's right. Well, if you look at the other... For each plaintiff, we identified the area they were in and identified which of the seven defendants was sourcing from that area. Do you have any sense of in this area, which doesn't really get defined in the complaint? Below it is like a province. It's a small subset of a geographic area. By area, you mean a particular province? Or a subset of that province. Okay. Do you have a sense of how many plantations or farms, some may not qualify as plantations, would be in that area that you're talking about? No, not as I stand here, Your Honor, but we are saying that in these areas, we can say that these three companies go there, regardless of how many farms are there. And then we identify the specific plaintiffs. You can't say that they buy from all those farms. I think a fair way to the complaint, based on the information we have, is that those three companies essentially share the output of that area. But I'm not willing to say, with my Rule 11 obligations, that it's 100%. But if we go to the merits... Sorry, if we go to causation issues, even on the merits, we don't have to be 100% right. We say 70% in the entire country. And I think we can say primarily from the regions that we have identified. I think Ivory Coast and Ghana have 2 million farms. That's somewhere in the record. It's a large number, Your Honor. The area where Kubele worked, how many farms are in that area? That I don't know, Your Honor, because to me, in drafting the complaint, whether it was 100 or 1,000, if virtually all of them are supplying those three defendants, that's the issue. It's likely, then, that one or more of the defendants are responsible for the plantation in that area where the plaintiff was injured. That's our argument. Even if it's on the low side and it's 100 farms in the area instead of 1,000, you know, Kubele was at one farm. Yes, Your Honor. It seems... Well, even if we apply the 70%, the odds of 70%... So I'm not saying that this works for you, but that would suggest a 70% chance. At the lowest. You can trace what happened to... The very unfortunate thing that happened to Kubele, you could trace that. That's right. And at pages 19 to 20 of our supplemental brief, we cite cases like Amerfeti versus Obama that say more probable than not is the standard, that even if we were on the merits, we could argue that it's more probable than not, with 70% of control of the entire industry, that any given plantation is within that 70%. That's more than 51%. The complaint says that Kubele's farm was eight hectares. Do you have a sense of how big eight hectares is? That's a small farm. I don't know the equivalent... He was the only worker, wasn't he? Yes. Which is really, really small. Yeah, and certainly... I think you would have to think that no matter how small the farm, even a farm that's only eight hectares and has only one worker, no matter how small the farm, that these defendants bought from every farm, no matter how small it is. Yes, Your Honor. Every farm sells to somebody, and 70% of that goes to the seven defendants collectively. Every farm sells to somebody, and if we... And 30% don't sell to these defendants. That's correct. In the entire country, though, there's lots of areas that are not on... We have no idea for this province, this area. We have no idea for this area, whether it's 70%, whether the defendants buy from 70% of the farms, or from 99% of the farms, or 50% of the farms. There's nothing in this complaint to let us know that. It's 70% or more, and again, I think that... Well, can it be 70% more if it's 70% nationwide? That means in some areas it's less, in some areas it's more. That's correct. There are areas on the map... This area could be less. Not because... It cannot, because it was one of the areas that were specifically identified as supplying to those three companies. There are areas on the map, Cote d'Ivoire, that don't identify anybody who is buying their cocoa. Some of these areas are free areas. The map that I'm... You say they primarily supply these defendants. You don't say that the defendants primarily obtain their cocoa from this area, because you could have a whole bunch of small farms that primarily, in fact, almost exclusively supply these defendants, but they're so small that collectively they provide 0.5% of all the cocoa that's purchased. In fact, there's other areas where they primarily purchase from. I had read this as saying these farms, their big customer is these companies, correct? Indeed. This area could be their big source of cocoa. The areas that we described in the complaint in the paragraphs align with the blankets. Those are the main cocoa producing areas. It is significant, and it makes no difference to causation if they're collecting a little bit from 20 farms or a lot from one farm. The fact is that that area produces for those three companies. Can I ask you about page 74 of your complaint? For paragraph 74, rather, it's JA-41, and let me know when you're there. Yes, Your Honor. It says, Nestle, like the other defendants, has been forced to admit that the vast majority of Nestle's cocoa is sourced through untraceable channels. So we've been talking for an hour and a half about traceability. Seems like to get standing, you need traceability, and yet you're saying the cocoa is untraceable. But not in the areas where the plaintiffs work, and that's why the 70% figure exists. There are areas that are sort of off the map, and the companies do buy from them, and that's what the allegation is. It says the vast majority of their cocoa. Not that this is a one-off thing. The vast majority is untraceable. The net raises the percentage of the places where we do identify where the plaintiffs were working, and that's what matters here. Where were the plaintiffs working, and were they in an area that bought from the defendant? That makes that percentage go up from 70% if there's larger areas that they're not buying. My plaintiffs weren't in and weren't identified here. And I think, again, the areas that you don't know how big they are. No, Your Honor, but what we have to know is that in the areas we identify the plaintiffs worked, we are able to say that those are supplying to the named defendants in those paragraphs. What goes on over there in the uncharted territories is not relevant to the question of is it likely that in an area that they do buy from that is on our map that the plaintiff was working there while he was a slave. There was a lot of other things said. I just would like to point out that the defendants can't have it both ways. They're claiming that they visit all their farms, that they're ending child labor, but when it comes to being responsible for what's happening on those farms, in paragraphs 50 and 51, we allege they go there. Even if they visit all of their farms, it doesn't mean they visited Kublai's farm. Or any of the other plaintiffs' farms. It's a reasonable inference. If they say they're visiting their farms and they're working hard to end child labor, they wouldn't have any reason to visit a farm they don't source from, right? Well, we're alleging they do source from. Not plausibly in the specificity. Well, again, if it's only 70%, and we're able to say with certainty that in that area of Doloa where Kublai worked, that these companies are sourcing from there. If it's only 70%, that's more probable than not, and that's the standard that we have to meet for causation. Even that's for merits, not for purposes of standing where the allegations have to be assumed as true. What's your best case that's just a statistical probability? Just a statistical probability. I understand that's the legal test, but that's normally applied in cases where there's an accused causing the harm. What is your best case that if from this court or Supreme Court or another court of appeals that we're not certain who hurt this person, but there's a 70% chance the defendant did, that was sufficient for standing? Well, most of the statistical cases, as you know, Your Honor, are trying to identify the injury, whether this person was injured. I'm not going to have any cases for you on the other area. But these people were injured, and then the question is, what is the probability that the defendants are responsible for that? What's your best case that just alleging a statistical probability is sufficient at this stage, the very early stage? Well, we have several. Again, this was in our supplemental brief in 19 to 20, but the Elmer Fetty case versus Obama, where the court said, this is this court 654 F31 at H5, the civil preponderance of the evidence standard merely requires the plaintiff's support his position with the greater weight of the evidence. And then we change site a bunch of other cases. Do plaintiffs involve a scenario like this where, for understandable reasons, it's very hard to tie a defendant to a particular plaintiff? I mean, it's not the words that matter to me. It's a similar factual context like this. Well, I think Chapman versus American Cyanide Company, which we cite 861 F2, 15- What was going on in there? What happened in that case? They're trying to figure out whether several companies were manufacturing vaccines, and the plaintiffs were injured by a vaccine. And the court used a statistical analysis to determine that this particular company could be liable based on the statistical probability, given the percentage of the total vaccine that they produced. And I think that is fairly applicable to this situation. And that's, again, American Cyanide 861 F2, 15- That's your sample number? I'm not 100% sure, so let me be clear. 861 F2, 15-15, and the quote is at 15-17 to 20, and that's 11th Circuit in 1988. Just one last word, Your Honor, if I could- Sorry, one more time. I'm sorry. One more time. 861- Excuse me, Your Honor. 861- What? Do you have that citation? Yes, I got it. Sorry, I'm not as fast as you are. 861 F2, 15-15, at 15-17 to 20. Perfect. 11th Circuit. And is that cited in one of your briefs? I'm not 100% sure. I should be, but it's the case that you asked for. I appreciate that I asked for it. If it is, it's in the supplemental brief at 19-20. Can I go back to- A moment ago it seemed like you were saying that the defendants inspected all of their farms, and we were kind of going back and forth a little bit about, well, even if they inspected all of their farms, it doesn't necessarily mean they inspected Kublai's farm. But I'm now looking at, I think it's JA-37, paragraph 67 of the complaint, and it looks like you don't allege that these companies visit all of their farms or inspect all of their farms. You say Nestle's COCO plan admits that at best its monitoring activities extend to one-third of its supply chain. Officials of the WCF and the ICI and the FLA admitted the number is high, but at most 20-30% of any member's COCO supply chain is with any of their programs. Out of 70 cooperatives in Cote d'Ivoire, only 22 have implemented CLMRS. It just seems like from this paragraph, the defendants don't inspect all of their farms. Well, that's correct, Your Honor. That's a lot of farms. They don't inspect the farms that are not there either. That's correct. They probably do it on a rolling basis. But if the question is, do they have knowledge? And that's the angle for when they inspect, they see what's there. But in paragraphs 45 to 58, we have quite a bit of information about other sources of their knowledge, including years and years and years of reporting to them that there's child slavery on their plantations, and it remains about the same. And I would point out, Your Honors, that in paragraph 157, we do point out that across the years when these companies in 2001 said, all right, we're going to fix this. Don't regulate us. We're going to fix this. 23 years later, it's worse. And in 2020, the U.S. Department of Labor did a study that said there's 1.56 million children working today on these cocoa farms, and that's in paragraph 155. So that goes to our theory that, as Judge Millett was alluding to. That statistic strikes me as two things. One, number one, beyond tragic, extremely, extremely tragic. Number two, it's that widespread, it seems like it should have been easier for you to find a farm that definitely sold cocoa that wound up at Nesla or Fargo or wherever. Your Honor, it is very dangerous for someone who looks like me to be wandering around those plantations. The way we found our plaintiffs is that they had been trafficked from Mali, enslaved for a period of years. They then escaped at some point and went back to Mali. So I interviewed them in Mali after they had been through this horrific ordeal. And that was the extent of information they were able to give me. They could not say, well, a guy with a Nestle outfit came, but I think it's more probable than not that Nestle or one of the other seven sold that company's, that plantation's cocoa to them. That's what we allege. And that, at this point, is the best we can do. But I think it's very important to stress again that the defendant's allegations are, the defendant's claims are, we're good companies. We're there inspecting all the time. How can you say that we're using child slaves? Well, the number went up after 23 years of them claiming that they're fixing that. And they are the leaders, as Judge Millett was alluding to, of using and protecting a system that uses forced child labor or child slavery. And I think that is a good place to conclude. Can I ask you one more question? I'm sorry. In paragraph 51, you talk about defendants and their agents having these ongoing relationships with the plantation. Who are their agents? Well, thank you, Your Honor. Two categories of agents, based on my knowledge. One is their employees. They send people over there. There are people based there for these companies. This is such an important source of cocoa for them in the world. And then some of them do hire a middleman company to sort of manage their supervision of the plantations. That's not in this complaint. It's a level of detail we didn't need for purposes of standing. But that is a fact based on my knowledge. Thank you. A second ago, I think you just said, you haven't been to Cote d'Ivoire for the reasons that you gave and that it would be very, very difficult. But I think paragraph one of your complaint says that you do have a research team that spent three years in Cote d'Ivoire? Yes, Your Honor. The first of all, I have been to Cote d'Ivoire many, many times. What I'm not doing is just heading off into the field, looking for things. My searches are more targeted. I have a team on the ground. But what they what's very difficult even for them to do is to walk up to a farm where a child is working and enslaved and start asking questions. The overseer has a machete, maybe even a gun. So that's not. That makes total sense. Thank you. Any other questions? I do, actually. Sorry. This one and I just keep going back to the same hypothetical. I have all day, Your Honor. I just want to make sure I understand the statistical likelihood. So let's go back to the same scenario. Two plantations, one of which is the one at which the plaintiff is subjected to forced labor. And what we know is that the defendant purchases cocoa from the Ivory Coast, which consists of two plantations, one of which has the forced labor going on within it that affected the if that plantation produces 70 percent of the cocoa and Ivory Coast and the other plantation produces 30 percent. But all you know about the defendant is that they buy cocoa from the Ivory Coast. Is it right that under your statistical likelihood theory, then you would say that's fair traceability? Is it that the defendant, the company that isn't using the forced labor of the victim buys 70 percent of the cocoa and the Ivory Coast, the company, the plantation at which forced labor occurs produces 70 percent of the cocoa produced by Ivory Coast together, a hundred. And what we know is that the defendant purchases cocoa from the Ivory Coast. If the defendant is only. Well, based on a statistical analysis, I would have to say yes, that that would be traceable for purposes of standing and it would not survive merits. The court has no further questions. Thank you. Thank you.
judges: Srinivasan; Millett; Walker